## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| T.S. by and through his parents and guardians,<br>T.M.S. and M.S., individually and derivatively on<br>behalf of the Heart of CarDon, LLC Employee<br>Benefit Plan,<br><br>                Plaintiff,<br><br>v.<br><br>HEART OF CARDON, LLC, and<br>HEART OF CARDON, LLC EMPLOYEE<br>BENEFIT PLAN,<br><br>                Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:20-cv-01699-TWP-MG |

## ENTRY ON DEFENDANTS' MOTION FOR RECONSIDERATION
## OR TO CERTIFY FOR INTERLOCUTORY APPEAL

This matter is before the Court on a Motion to Reconsider the Court's Entry on the Motion for Judgment on the Pleadings Regarding Count III or in the Alternative Motion to Certify Standing Issue for Interlocutory Appeal, filed by Defendants Heart of CarDon, LLC ("CarDon") and Heart of CarDon, LLC Employee Benefit Plan (the "Plan") (collectively, "Defendants") (Filing No. 53). Defendants ask the Court to reconsider its denial of their Motion for Judgment on the Pleadings regarding Count III of the Amended Complaint and to find in their favor. Alternatively, if the Court denies the Motion to Reconsider or clarifies its decision and expressly rules against the Defendants' standing argument, Defendants request that the Court certify the standing issue for interlocutory appeal. For the following reasons, the Court **denies** Defendants' request to reconsider, but **grants** their request to certify the standing issue for interlocutory appeal.

## I.      BACKGROUND

The facts of this case are set forth in detail in the March 16, 2021 Entry on Defendants' Motions for Judgment on the Pleadings (Filing No. 50 at 2–3) and are repeated in this Order.

Four-year-old T.S.'s healthcare coverage is provided through his parent T.M.S.'s employment with CarDon (Filing No. 31 at 3). In September 2018, T.S. was diagnosed with autism spectrum disorders. The diagnosing physician recommended that T.S. receive applied behavior analysis therapy to help him "achieve developmental advances and maintain his gross and fine motor and speech and communication skills." *Id.* at 6–7. Following pre-authorization for six months of services by the Plan's previous third-party administrator, T.S began receiving applied behavior analysis therapy in December 2018. *Id.* at 7. The next month, January 2019, the Plan's third-party administrator changed to Cypress Benefit Administrators LLC ("Cypress"). *Id.* at 8.

In March 2019, Cypress sent an Explanation of Benefits ("EOB") letter denying coverage for T.S.'s applied behavior analysis therapy. *Id.* at 8. After initially explaining that the services were denied because an "'insurance update [was] needed from [the] member,'" Cypress issued a new EOB in June 2019 instructing that "'No benefits allowed for this service/diagnosis. See the General Exclusions under your plan." *Id.* (quoting Filing No. 31-1 at 21, 32). In a subsection titled "Behavioral Health" under the "Exclusions" section—which is separate from the "General Exclusions" section referenced in the June EOB letter (*see* Filing No. 31-1 at 79–81)—the Plan excludes "'Charges for services, supplies, or treatment for Autism, Asperger's and Pervasive Developmental Disorders' and 'Charges for Applied Behavior Analysis (ABA Therapy).'" (Filing No. 31 at 8 (quoting Filing No. 31-1 at 139).) The Plan, however, "covers various medical/surgical services to treat autism spectrum disorder, including development delay and autism spectrum disorder screening/diagnostic services, prescription drugs [including Risperdal and Abilify], and pediatric visits." *Id.* at 9.

In August 2019, T.S.'s mother, pursuant to the terms of the Plan, appealed the denial of services to Cypress. *Id.* A March 31, 2020 letter confirmed that the claims were correctly denied

because "the diagnosis [Autism Spectrum Disorder] is not covered." *Id.*; Filing No. 31-2 at 4–5. For that entire period—from February 2019 to March 2020—T.S. did not receive applied behavior analysis therapy (Filing No. 31 at 9). T.S.'s parents then filed the instant action on behalf of T.S., and Defendants moved for judgment on the pleadings on all three counts in two filings (Filing No. 22; Filing No. 36).

In the March 16, 2021 Entry, the Court granted Defendants' Motion for Judgment on the Pleadings on T.S.'s ERISA and Parity Act claims, (Filing No. 22), and Counts I and II of the Amended Complaint were dismissed with prejudice. (*see* Filing No. 50 at 19). However, the Court denied judgment on the pleadings with respect to Count III, (Filing No. 36), T.S.'s Affordable Care Act ("ACA") and Rehabilitation Act claim. Specifically, the Court determined the Defendants unlawfully discriminated against T.S. and others under the Affordable Care Act by excluding benefits for health care related to autism spectrum disorder, Asperger's, and pervasive developmental disorders, and for Applied Behavior Analysis Therapy specifically." *See id.* at 12–13, 16–19 (quotations omitted). In short, the Court held that "[b]ecause 'all of' CarDon's operations are covered by Section 504 . . . , T.S.'s claim under Section [1557] of the Affordable Care Act can, at this stage in the litigation, proceed" because "all of" CarDon's operations are covered by Section 504 of the Rehabilitation Act ("Section 504")[1] (*see* Filing No. 50 at 18–19). Defendants seek reconsideration of the ruling or in the alternative, request that the Court certify the standing issue for interlocutory appeal.

---

[1] Section 18116(a) of Title 42 (*i.e.*, "Section 1557" of the ACA) provides that "an individual shall not, on the ground prohibited under . . . section 794 of Title 29 [i.e., "Section 504" of the Rehabilitation Act], be excluded from participation in, denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." Section 1557 goes on to instruct that "the enforcement mechanisms provided for and available under" Section 504 "shall apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a). Section 504, in turn, provides that no "individual with a disability" shall "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

## II.     <u>DISCUSSION</u>

In its Motion for Judgment on the Pleadings on Count III, CarDon argued that T.S. is an improper plaintiff and lacks standing to bring a Section 1557 claim against it because T.S. is not a beneficiary or intended beneficiary of the federal funds CarDon receives as a health care provider. Defendants contend that "the Court accurately summarized CarDon's argument on this point in its Entry concerning Counts I and II, " but then "analyzed a different" contention than the one they presented with respect to Count III, namely that "T.S. is an improper plaintiff and lacks standing to bring a Section 1557 claim against CarDon." (Filing No. 54 at 1–2.) The Court will first address the Defendants' request for reconsideration before turning to their request for an interlocutory appeal.

### A.     <u>Reconsideration</u>

#### 1.     <u>Legal Standard</u>

Because no final judgment has been entered in this case, Defendants have properly classified this as a motion to reconsider under Federal Rule of Civil Procedure 54(b). *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). The Court applies a similar standard as applied to motions to alter or amend a judgment under Rule 59(e). Motions to reconsider filed pursuant to Rule 54(b) or Rule 59(e) are for the purpose of correcting manifest errors of law or fact or to present newly discovered evidence not available at the time of briefing, and a motion to reconsider an order under Rule 54(b) is judged by largely the same standard as a motion to alter or amend a judgment under Rule 59(e). *Katz-Crank v. Haskett*, No. 1:13-cv-159-TWP-DML, 2014

WL 3507298, at *2 (S.D. Ind. July 14, 2014); *Woods v. Resnick*, 725 F. Supp. 2d 809, 827–28 (W.D. Wis. 2010).

Motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *State Farm Fire & Cas. Co. v. Nokes*, 263 F.R.D. 518, 526 (N.D. Ind. 2009). The motion is to be used "where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). A motion to reconsider under Rule 54(b) also may be appropriate where there has been "a controlling or significant change in the law or facts since the submission of the issue to the Court." *Id.* (citation omitted).

The purpose of a motion for reconsideration is to ask the Court to reconsider matters "properly encompassed in a decision on the merits." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989). The motion "will be successful only where the movant clearly establishes: (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (citation and quotation marks omitted). A manifest error "is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citation and quotation marks omitted).

"Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004) (citation and quotation marks omitted). Relief

pursuant to a motion to reconsider is an "extraordinary remed[y] reserved for the exceptional case." *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008).

## 2.  **Analysis**

In the brief supporting their Motion for Reconsideration, Defendants explain that "whether CarDon is a proper defendant based on the federal funding it receives is not the legal question [they] intended to raise." ([Filing No. 54 at 4](.) Defendants contend that in error or misapprehension, "the Court focused its analysis on whether CarDon is a proper defendant rather than on whether T.S. is a proper plaintiff." *Id.* In response, T.S. argues that the "Court could hardly have misunderstood arguments it summarized correctly in its Entry, using the very language Defendants now use to 'clarify' their position." ([Filing No. 59 at 10](.) Moreover, "Defendants' motion does no more than repeat the argument that Section 1557 claims are limited to intended beneficiaries of federal funds because Section 1557 incorporates the 'enforcement mechanisms' of Section 504 and Section 504 is based on Title VI." *Id.* at 11.  T.S. asserts that "Section 504 does not require a plaintiff to be an 'intended beneficiary' of the federal funds" and that CarDon does "not point to a single case decided after [1988], which holds that a plaintiff must be an intended beneficiary of the federal assistance to allege disability discrimination under Section 504." ([Filing No. 59 at 6-7](, 9-10, 12.)

In reply, Defendants maintain that there remains "a genuine legal dispute that the Court has not addressed." ([Filing No. 60 at 2](.) "Respectfully," Defendants continue, "the Court did not address CarDon's standing argument," and *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)—a case discussed at length below—"is hardly irrelevant post-1988 and has consistently been utilized to consider the issue of proper standing." *Id.* at 3.  Defendants argue, "the aspect of the law that changed after *Simpson* does not relate to the standing question." *Id.* at 4. This is where Defendants are critically mistaken. To explain how, the Court—to clarify its

earlier Entry for Defendants (*see* [Filing No. 50](#))—must canvass the progression of the law concerning the scope of Section 504 and, as necessary, Title VI of the Civil Rights Act of 1964 ("Title VI").

When passed by Congress in 1973, Section 504 provided that no "handicapped individual … shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity* receiving Federal financial assistance."  Rehabilitation Act of 1973, Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (emphasis added). Seven years later, the Seventh Circuit confronted the scope of this statute's undefined "program or activity" phrase when it held that a discharged employee—who, importantly, had not been excluded from participation in or denied benefits under any program or activity that *specifically received federal financial assistance*—lacked "standing" to bring a claim under Section 504. *Simpson*, 629 F.2d 1226. In foreclosing standing, the Court reasoned that Section 504 (as it stood in 1980) did not

> generally forbid discrimination against the handicapped by recipients of federal assistance. Instead, its terms *apparently* require that the discrimination must have some direct or indirect effect on the handicapped persons *in the program or activity receiving federal financial assistance*. To be actionable, the discrimination must come in the operation of the program or manifest itself in a handicapped individual's exclusion from the program or a diminution of the benefits he would otherwise receive from the program.

*Id.* at 1232 (emphases added).  In other words, as has become the canonical phrasing in this Circuit, "private recovery under [Section] 504 is restricted to *intended beneficiaries* of a federal program." *Id.* at 1235 (emphasis added). This outcome flowed from the necessary judicial defining (hence, "apparently") of "program or activity" as used in Section 504, with the *Simpson* court ultimately determining "that Congress did not intend to extend protection under Title VI [and thus the almost-carbon-copied Section 504] to any person other than an intended beneficiary of federal financial assistance."  *Id.*  Notably, the *Simpson* court—in its narrow definition of the phrase—rejected the

argument that "federal assistance to one part of an employer's business thereby brings the entire business under the coverage of [Section] 504." *Id.* at 1236. Thus, determining whether an individual was an "improper plaintiff" because he was not an "intended beneficiary" of federal funds necessarily required examining whether an entity was a "proper defendant" based on its receipt of those federal funds. In 1986, the Seventh Circuit recommitted to this rationale, reaffirming "that in order to bring a private action *under Title VI* the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe on Behalf of Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 418–19 (7th Cir. 1986), *overruled on other grounds by Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996) (cleaned up) (emphasis added).

Meanwhile, in 1984, the United States Supreme Court held that the receipt of federal grants by some of a college's students did not trigger institution-wide coverage under Title IX, which contained a similar "program or activity" provision to Section 504 and Title VI. *Grove City Coll. v. Bell*, 465 U.S. 555 (1984). The Supreme Court—tracking the reasoning of the Seventh Circuit in *Simpson*—held that widespread coverage was not prompted because the federal grants represented financial assistance to *only* the college's financial aid program, so that was the sole "program or activity" that could be regulated under Title IX's nondiscrimination provision. *Id.* at 574–75. In other words, the Supreme Court rejected the conclusion that an institution "itself is a 'program or activity' that may be regulated in its entirety" under Title IX. *Id.* at 570–71. That same day, the Supreme Court applied this understanding to Section 504's coverage of a "program of activity receiving Federal financial assistance": "Clearly, this language limits the ban on discrimination *to the specific program that receives federal funds*." *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635–36 (1984) (emphasis added).

But in 1988, Congress—over President Ronald Reagan's veto—passed the Civil Rights Restoration Act of 1987 (the "CRRA") to vindicate the scope of protection following these holdings. Specifically, the CRRA provided that:

> The Congress finds that-
>
> (1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and title VI of the Civil Rights Act of 1964; and
>
> (2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered.

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 § 2, 102 Stat. 28, 28 (1988). Relevant here, the CRRA clarified that a "program or activity" under both Section 504 and Title VI encompassed "*all of the operations of . . . an entire* corporation, partnership, or other private organization . . . which is principally engaged in the business of providing . . . health care . . . *any part of which* is extended Federal financial assistance." *Id.* § 4, 102 Stat. at 29–30 (codified at 29 U.S.C. § 794(b)(3)(A)(ii)) (Section 504); *Id.* § 6, 102 Stat. at 31 (codified at 42 U.S.C. § 2000d-4a(3)(A)(ii)) (Title VI) (emphases added).[2] As the Supreme Court later acknowledged, in "seeking to correct what it considered to be an unacceptable decision on our part in *Grove City*," "Congress

---

[2] The Court's earlier Entry stated that "[t]hough Title VI and Section 504 may have placed parallel requirements on a plaintiff at one point, the two diverged—at least as far as this Entry is concerned—following the latter's 1988 amendment." (Filing No. 50 at 17.) That Entry did not deeply examine the CRRA's effect on Title VI. It is evident, however, that this act identically amended the pertinent language of both statutes. Accordingly, any discussion of the applicability of *Simpson* (or *Doe on Behalf of Doe*) to Section 504 claims is equally relevant to Title VI claims.

broadened the coverage of these antidiscrimination provisions" through the CRRA. *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 73 (1992).[3]

The CRRA, then, statutorily dismantled the foundation undergirding the *Simpson* court's holding that a Section 504 (or Title VI) plaintiff must be an "intended beneficiary" of the federal financial assistance received: "that the discrimination must have some direct or indirect effect on the handicapped persons *in the program or activity receiving federal financial assistance*." 629 F.2d at 1232 (emphasis added). In other words, because the narrow interpretation of "program or activity" drove the Seventh Circuit's "intended beneficiary" holding, *Simpson*'s rationale no longer rings consonant with the post-CRRA Section 504 (or, again, Title VI), which made clear that the scope encompassed "all of the operations of" certain covered entities, "any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b)(3)(A)(ii); 42 U.S.C. § 2000d-4a(3)(A)(ii)).

To be sure, district courts in this Circuit continue to cite *Simpson*'s "intended beneficiary," or "nexus," holding as binding precedent, in both Section 504 and Title VI contexts. A sister court, for example, instructed that, "[i]n the case of Section 504, determining whether standing has been met falls to a determination of whether or not the Plaintiff in question is one of the intended [beneficiaries] of the federal financial assistance in question." *Blazquez v. Bd. of Educ. of City of Chicago*, No. 05-CV-4389, 2006 WL 3320538, at *4 (N.D. Ill. Nov. 14, 2006) (quotation of *Simpson* omitted); *see also Doe v. City of Chicago*, 883 F. Supp. 1126, 1134–35 (N.D. Ill. 1994)

---

[3] Though Justice White indicated that Congress "broadened" the scope of the provisions, during the floor debate to override the "first veto of a civil rights act since President Andrew Johnson vetoed the Civil Rights Act of 1866," https://www.politico.com/story/2018/03/22/congress-overrides-reagan-civil-rights-veto-march-22-1988-470686, Senator Robert Packwood of Oregon stated that "all we have done is change the law back to what we thought it was. We have not expanded it beyond what we thought it was. We have not attempted to add any new obligations beyond what we thought existed. There was never a more status quo bill." 134 Cong. Rec. S2730-02, 1988 WL 1085029. Senator Robert Stafford of Vermont, an original sponsor of Section 504, noted that "the intent of these measures has been lost by the court ruled 'program-specific' rather than 'institution-wide' definition originally intended by legislators." *Id.*

(explaining that "to state a claim under Section 504, plaintiff must allege . . . that plaintiff is an intended beneficiary of the federal assistance") (citing *Simpson*). And district courts in this Circuit have even more recently (and consistently) noted that "[t]o bring a private action under Title VI, the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Rosas v. Bd. of Educ. of the City of Chicago*, No. 19-CV-2778, 2021 WL 1962397, at *11 (N.D. Ill. May 17, 2021) (quotation of *Simpson* omitted); *Cieslik v. Bd. of Education of City of Chicago*, No. 1:19-CV-05553, 2021 WL 1172575, at *2 (N.D. Ill. Mar. 29, 2021) ("[A] private cause of action can be brought [under Title VI] only by the 'intended beneficiary' of the financial assistance.") (citing *Simpson*); *Veljkovic v. Bd. of Educ. of City of Chicago*, No. 20 C 1551, 2020 WL 7626735, at *4 (N.D. Ill. Dec. 22, 2020) ("[T]o bring a private action under Title VI the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program.") (quotations of *Doe on Behalf of Doe* and *Simpson* omitted); *Shebley v. United Cont'l Holdings, Inc.*, No. 17-CV-01906, 2020 WL 2836796, at *6 (N.D. Ill. May 31, 2020) ("Under the well-established law of this Circuit, the Shebleys lack standing to sue under Title VI unless they are intended beneficiaries of federal financial assistance provided to a program or activity.") (citing *Doe on Behalf of Doe* and *Simpson*).

As this continued reliance on the forty-one-year-old *Simpson* demonstrates, the Seventh Circuit has not expressly revisited the doctrine since deciding the case in 1980 (and reaffirming it in the Title VI context in *Doe on Behalf of Doe* in 1986)—years before passage of the CRRA. *Cf. Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) (briefly noting, without mentioning *Simpson* or *Doe on Behalf of Doe*, that "'program or activity' was expanded from a specific program or specific activity to 'all the operations' of [an entity] that conducted the program or activity"). While Defendants correctly note that "'district courts in this Circuit have consistently

applied . . . *Simpson*' for four decades," ([Filing No. 60 at 3](Filing No. 60 at 3) (citing *Shebley*, 2020 WL 2836796, at *6)),the Seventh Circuit has also held

> [W]e give considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling. However, we are cognizant of the fact that we are not absolutely bound by them, and must give fair consideration to any *substantial* argument that a litigant makes for overruling a previous decision.

*United States v. Reyes-Hernandez*, 624 F.3d 405, 412 (7th Cir. 2010) (quoting *Haas v. Abrahamson*, 910 F.2d 384, 393 (7th Cir. 1990)).

As described above, Congress, through passing the CRRA over a veto, clarified the wide scope of "a program or activity" under Section 504 and Title VI.

> In cases where statutory precedents have been overruled, the primary reason for the Court's shift in position has been the intervening development of the law, through either the growth of judicial doctrine or *further action taken by Congress*. Where such changes have removed or weakened the conceptual underpinnings from the prior decision, . . . the Court has not hesitated to overrule an earlier decision.

*Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989) (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 480–481 (1989)) (emphasis added); *see generally* Frank Sullivan, Jr., "What I've Learned About Judging", 48 Val. U. L. Rev. 195, 200–203 (2013) (explaining how "Judging Is Often a Dance with the Legislature").

While Defendants' Motions (and some district court decisions) understand *Simpson*'s holding to address whether plaintiffs have "standing" to assert Section 504 claims, the United States Supreme Court has moved away from using "standing" terminology to describe the reach of statutory causes of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("'[P]rudential standing' is a misnomer as applied to the zone-of-interests analysis, which asks whether this particular class of persons ha[s] a right to sue under this substantive statute.") (citation omitted); *Friends of Trumbull v. Chi. Bd. of Educ.*, 123 F. Supp. 3d 990, 995

(N.D. Ill. 2015) ("Settled law has long distinguished between Article III standing and the statutory zone of interests.") (citing *Lexmark*, 572 U.S. at 125–28).

The holding of *Simpson* concerned the zone of interests that Section 504 protects, not standing in the Article III sense of the term. Semantics aside, the Supreme Court has

> consistently held that for a plaintiff's interests to be arguably within the "zone of interests" to be protected by a statute, *there does not have to be an indication of congressional purpose to benefit the would-be plaintiff*. The proper inquiry is simply whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected by the statute. Hence in applying the "zone of interests" test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff.

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998) (quotations and citations omitted) (emphasis added).[4] In *Simpson*, the Seventh Circuit—again, before Congress passed the CRRA—very narrowly dictated that Section 504's zone of interests included only the intended beneficiaries of federally funded programs or activities. While the Seventh Circuit has not examined the significant legislative clarification on this conclusion, the interest sought to be protected by T.S. is arguably within the broad zone of interests to be protected by the statute: the CRRA clarified that protections under Section 504 are not constrained to the specific program or activity receiving federal financial assistance. In short, because *Simpson* is premised on a statute that has since been materially amended, continued reliance on its pertinent holding is misplaced. CarDon's receipt of federal financial assistance as a healthcare provider triggers institution-wide coverage under Section 504, rendering T.S. a "proper plaintiff" to bring a claim. *See T.W. v. New York State Bd. of L. Examiners*, 996 F.3d 87, 97 (2d Cir. 2021) ("Congress intended the

---

[4] Though *National Credit* concerned application of the zone of interests doctrine in the context of judicial review under the Administrative Procedure Act, the Supreme Court has "made clear, however, that it applies to all statutorily created causes of action; that it is a requirement of general application; and that Congress is presumed to legislate against the background of the zone-of-interests limitation, which applies unless it is expressly negated." *Lexmark*, 572 U.S. at 129 (cleaned up).

Rehabilitation Act to have broad reach, amending the statute to 'make clear that discrimination is prohibited throughout entire . . . institutions if any part receives Federal financial assistance.'") (quoting S. Rep. No. 100-64, at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3, 64 (emphasis added)); *McMullen v. Wakulla Cty. Bd. of Cty. Commissioners*, 650 F. App'x 703, 707 (11th Cir. 2016) (citing *Doyle v. Univ. of Alabama in Birmingham*, 680 F.2d 1323, 1326 (11th Cir. 1982) (interpreting "program or activity" to mean only the specific parts of a governmental unit that directly receive federal financial assistance)) ("*Doyle*'s narrow interpretation of 'program or activity' is no longer good law."); *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 200 (3d Cir. 2008) ("Since the passage of the Civil Rights Restoration Act, this Court has interpreted 'program or activity' broadly."). The Court, accordingly, **denies** Defendants' Motion because they have failed to show that the Court committed a manifest error of law. *See Cincinnati Life Ins. Co.*, 722 F.3d at 954.

## B.    Interlocutory Appeal

### 1.    Legal Standard

Under 28 U.S.C. § 1292(b), four criteria guide a district court's decision to certify an order for interlocutory appeal:

> [1] there must be a question of *law*, [2] it must be *controlling*, [3] it must be *contestable*, and [4] its resolution must promise to *speed up* the litigation. There is also a nonstatutory requirement: the petition must be filed in the district court within a *reasonable time* after the order sought to be appealed. Unless *all* these criteria are satisfied, the district court may not and should not certify its order.

*Ahrenholz v. Bd. of Trs.*, 219 F.3d 674, 675–76 (7th Cir. 2000) (emphasis in original) (citation omitted).

### 2.    Analysis

Defendants, in the alternative, argue that "[i]f the Court denies [their] Motion to Reconsider or considers and addresses [their] standing argument but denies the Motion for Judgment on the

Pleadings on Count III, the Court should certify the standing issue for interlocutory appeal." (Filing No. 54 at 5.)  Defendants first maintain that this case involves a "pure" question of *law*, noting that the Seventh Circuit has explicitly noted that any inquiry about "standing is a question of law."  *Id.* (citing *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 615 (7th Cir. 2015)).  Here, the single question is "does a beneficiary under a group health plan (who is not a patient of the employer or the plan) have standing under Section 1557 to sue a defendant who receives federal funding only in the form of Medicare and Medicaid payments on behalf of patients receiving health care?" *Id.* (citation omitted). Second, Defendants contend that the question of law is *controlling* because "if T.S. does not have standing, then the Section 1557 claim would be dismissed, affecting the course of the remaining litigation by terminating it altogether." *Id.* at 6.

Third, the controlling question of law is *contestable* because "federal courts across the country have been determining the import of [the statutory language at issue], and the parties in this lawsuit contest the extent to which limitations to the underlying enforcement mechanism statutes apply to claims brought under Section 1557." *Id.* In fact, "this issue does not appear to have been ruled upon by another court, leading to the present, substantial differences of opinion." *Id.* Fourth, this controlling and contestable question of law would "speed up the litigation because the outcome of the standing issue could end the litigation entirely." *Id.* at 7. Finally, the motion was timely when it was filed "less than three weeks" after the Court resolved the Motion for Judgment on the Pleadings.  *Id.* (citation omitted).

In response, T.S. takes issue with the contestability prong, arguing that "Defendants have not demonstrated that 'exceptional circumstances' warrant immediate appeal." (Filing No. 59 at 13–14 (citing *Knauf Insulation, LLC v. Johns Manville Corp.*, No. 1:15-cv-111-TWP-MJD, 2020

WL 4261814, at *6 (S.D. Ind. July 24, 2020)).)  Specifically, T.S. maintains that the issue is not contestable when "Defendants do not point to a single case decided after the Supreme Court's ruling in *Consolidated Rail* and the 1988 amendment to Section 504, which holds that a plaintiff must be an intended beneficiary of the federal assistance to allege disability discrimination under Section 504."  *Id.* at 14.  T.S. argues that "Defendants fail to identify even one court that has adopted a view conflicting with the Court's Entry."  *Id.* at 14–15.  Instead, the "Entry is based on a sound application of black-letter statutory construction principles, making it unlikely that the Seventh Circuit would reverse the Court's ruling."  *Id.* at 15 (citing *LAJIM, LLC v. Gen. Elec. Co.*, No. 13 CV 50348, 2016 WL 626801, at *2 (N.D. Ill. Feb. 17, 2016)).

T.S. also argues that an interlocutory appeal would not speed up the litigation because "[t]he Seventh Circuit would have to decide [multiple questions of law] in Defendants' favor for this litigation to end."  *Id.* at 17.  In fact, interlocutory appeal could actually "serve only to drive up the parties' expenses and substantially delay resolution of the litigation" since "the likelihood that an immediate appeal would end the litigation is low."  *Id.* at 18.  In sum, "Defendants will have ample opportunity to seek the Seventh Circuit's opinion in the normal course of proceedings once final judgment is entered."  *Id.*  But if the Court grants this Motion, T.S. concludes that the Court should "certify the entire Entry so Plaintiff can appeal the Court's decision dismissing his Parity Act claims."  *Id.*

Defendants reply that "this Court has the discretion and authority to find the novel question of law presented here sufficient to meet the contestability standard." (Filing No. 60 at 6.) Even so, a divergence of authorities "indicates a rapidly developing need for clear and definitive direction from the courts on this contestable issue." *Id.* And resolution of the single question presented here—"does T.S. have standing under Section 1557 to bring his claim"—"would be sufficiently

16

controlling on appeal because it would end the case altogether." *Id.* at 6–7. Moreover, Defendants argue that "T.S. has not identified a harm or unreasonable cost to the parties for pursuing a streamlined legal argument." *Id.* at 7. Finally, the Court should deny T.S.'s "passing argument" for certifying the entire Entry because he "has failed to identify any facts or legal arguments satisfying the four statutory criteria found in 28 U.S.C. § 1292(b) or satisfying the additional requirement of timeliness." *Id.* at 7–8 (citing *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 212 F. Supp. 2d 903, 905 (S.D. Ind. 2002) ("[I]n Seventh Circuit practice, specific issues, rather than an order as a whole, are formally certified for appeal.")). In any event, "Local Rule 7-1(a) provides that '[a] motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court.'" *Id.* at 8.

The Court determines that certification of the issue regarding "standing" (but not the entire Entry) is appropriate for interlocutory appeal. The Court agrees with Defendants on the uncontested prongs—this is a controlling question of law that was brought within a reasonable time after the underlying Entry was docketed. As for contestability, courts should "examine the strength of the arguments in opposition to the challenged ruling. This analysis includes *examining whether other courts have adopted conflicting positions regarding the issue of law proposed for certification.*" *Emley v. Wal-Mart Stores, Inc.*, No. 1:17-cv-2350-SEB-TAB, 2020 WL 108374, at *5 (S.D. Ind. Jan. 8, 2020) (quoting *Bridgestone/Firestone*, 212 F. Supp. 2d at 909, 910) (emphasis added). As explained at length above, sister courts continue to favorably cite *Simpson* when discussing Section 504 and Title VI claims. *See Blazquez*, 2006 WL 3320538, at *4 (Section 504); *Doe v. City of Chicago*, 883 F. Supp. at 1134–35 (Section 504); *Rosas*, 2021 WL 1962397, at *11 (Title VI); *Cieslik*, 2021 WL 1172575, at *2 (Title VI); *Veljkovic*, 2020 WL 7626735, at *4 (Title VI); *Shebley*, 2020 WL 2836796, at *6 (Title VI). This question of law is particularly well-suited

for interlocutory resolution—in terms of "contestability"—because it concerns a decades-old precedent interpreting a long-amended statute that continues to be cited to foreclose claims at early stages of litigation.

Regarding "the promise to speed up litigation," quick appellate resolution of this issue could conclude this matter in its entirety: the sole issue remaining in this litigation could be precluded from proceeding on "standing" grounds. If, on the other hand, the Court is mistaken in its interpretation of the interceding impact of the CRRA on *Simpson*'s pertinent holding, this litigation could progress for quite some time before an appellate decision could correct that error.

In the Court's view, cases like this are what Congress envisioned when it passed § 1292(b). This federal issue is important, purely legal, and potentially dispositive (to not only this, but to many cases); reasonable minds could—and do—disagree on the continued viability of a long-standing precedent; a decision reversing the Entry will obviate the need for a trial; and a decision affirming the Entry could allow the current trial date to remain intact. Because the four statutory criteria, as well as the non-statutory timeliness factor, support certifying the Entry for interlocutory appeal, the Court **grants** Defendants' Motion to that end. But insofar as T.S. seeks certification of the entire Entry, because he has neither (1) filed a separate motion as demanded by Local Rule 7-1(a) ("Motions Must Be Filed Separately") nor (2) meaningfully discussed any of the factors the Court should consider in resolving his request, *see Ahrenholz*, 219 F.3d at 675–76, the Court declines T.S.'s request to certify the entire Entry.

## III.    CONCLUSION

For the preceding reasons, the Court **DENIES** Defendants' Motion for Reconsideration but **GRANTS** its alternative Motion to Certify for Interlocutory Appeal (Filing No. 53). Defendants may proceed to seek interlocutory appeal pursuant to Federal Rule of Appellate Procedure 5

regarding whether T.S. has "standing" to bring his claim pursuant to Sections 1557 and 504 (*see*

Filing No. 31 at 5–6).

       **SO ORDERED.**

Date: 7/14/21

                                  Hon. Tanya Walton Pratt, Chief Judge
                                  United States District Court
                                  Southern District of Indiana

DISTRIBUTION:

Blythe H. Chandler
TERRELL MARSHALL LAW GROUP PLLC
bchandler@terrellmarshall.com

Eleanor Hamburger
SIRIANNI YOUTZ SPOONEMORE
HAMBURGER PLLC
ehamburger@sylaw.com

Syed Ali Saeed
SAEED & LITTLE LLP
ali@sllawfirm.com

Toby J. Marshall
TERRELL MARSHALL LAW GROUP PLLC
tmarshall@terrellmarshall.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP
mwohlford@boselaw.com

Winthrop James Hamilton
BOSE MCKINNEY & EVANS, LLP
jhamilton@boselaw.com